**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  11-20152-CIV-ALTONAGA/Simonton**

**GUSTAVO ABELLA**,

      Plaintiff,

vs.

**TOWN OF MIAMI LAKES**
**COUNCILWOMAN NANCY SIMON**, *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

**THIS CAUSE** came before the Court on nine separately filed Motions to Dismiss, individually filed by Defendants Nancy Simon [ECF No. 36], A. Salazar [ECF No. 43], Raymond Del Valle [ECF No. 44], Hector Valls [ECF No. 45], Benjamin Rivera [ECF No. 46], Juan F. Rodriguez [ECF No. 47], Richard Baez [ECF No. 48], Frank Bocanegra [ECF No. 49], and Robert Parker [ECF No. 50].  Defendant Simon's Motion (the "Simon Motion") was filed on April 25, 2011, with the other eight Motions filed on May 31, 2011.  The Court has considered the parties' arguments and the applicable law.

**I.  BACKGROUND**[1]

Plaintiff, Gustavo Abella ("Abella"), is a resident of Miami-Dade County.  (*See* Am. Compl. ¶ 3 [ECF No. 17]).  Abella alleges a myriad of constitutional violations against public officials, namely police officers from Miami Lakes, Florida.  (*See* Am. Compl.).

**a.  Political Sign — Councilmember Nancy Simon, Officer Juan F. Rodriguez**

In February 2007, the City of Miami Lakes held a town meeting.  (*See* Am. Compl. ¶ 18). Plaintiff attended and spoke out against "an issue regarding posting commercial signs on the

---

[1]  The allegations in Plaintiff's Amended Complaint are taken as true.

right of ways in the streets of the Town of Miami Lakes."  (*Id.*).  Soon thereafter, Miami Lakes Police Officer Juan F. Rodriguez stopped Plaintiff outside of his daughter's school.  (*See id.* ¶¶ 18, 28).  Officer Rodriguez told Abella he had "received orders to ask [Abella] to remove the sign [he] had in the back of his pick up [sic] [truck]."  (*Id.* ¶ 28) (internal quotation marks omitted).  The sign read, "Councilmember Nancy Simon wants to pollute Miami Lakes with signs."  (*Id.* ¶ 18) (internal quotation marks omitted).  Abella alleges the police threatened to issue him a citation if he did not take down the sign.  (*See id.*).  He nevertheless refused to remove the sign.  (*See id.*).  Abella, allegedly believing Simon, a Miami Lakes elected official, ordered the police to approach him, asserts "Simon's actions were undertaken as retaliation for [Abella's] exercise of his First Amendment right to free speech."  (*Id.*).

Abella alleges the aforementioned actions taken by Councilmember Simon and Officer Rodriguez violate 42 U.S.C. § 1983.  (*See id.* Counts I, III).

### b.  Flyers — Officer Hector Valls

On January 7, 2008, Abella witnessed the president of his condominium association passing out flyers "with libel [sic] information against [Abella]."  (Am. Compl. ¶ 57).  The flyers contained a picture of Councilmember Simon and were addressed to all residents.  (*See id.*).  Plaintiff called the police to complain.  (*See id.*).  Officer Valls responded to Abella's request.  (*See id.* ¶ 58).  Upon Officer Valls's arrival, Abella asked him to write up an official police report.  (*See id.*).  Declining to take a report, Officer Valls took a flyer out of Abella's hand and stated "he had more important things to do."  (*Id.*) (internal quotation marks omitted).  Upon Abella's continued persistence that he write a report, Officer Valls asked, "[d]o you want to get arrested?"  (*Id.* ¶ 59) (internal quotation marks omitted).  Abella replied that if there were

"grounds to arrest him then to proceed." (*Id.* ¶ 60).  Officer Valls then told Abella to move out of his way, he put his car in reverse, nearly hit Abella, and left.  (*See id.* ¶ 61).

Abella alleges the aforementioned actions constitute an abuse of power, harassment, intimidation, and stalking against Officer Valls.  (*See id.* Count V(V[2])).

### c.  Parking Ticket Issue 1 — Officer Juan F. Rodriguez

In April 2007, Abella was in a drop-off area at his daughter's school when Officer Juan F. Rodriguez issued him a traffic citation because he had parked in a manner blocking handicap spaces.  (*See* Am. Compl. ¶ 33).  Abella claims he "was not parked, had the motor running and was waiting for his wife who went to drop off their daughter."  (*Id.*).  Before issuing the ticket, Officer Rodriguez asked Abella to move his car.  (*See id.* ¶ 34).  Abella declined to listen, stating instead he could not move it because school construction limited available parking spaces.  (*See id.*).  Abella then got out of his car and took pictures of the handicap spaces, which were occupied by school employees' vehicles.  (*See id.* ¶ 35).  Abella fought the ticket, but lost.  (*See id.* ¶ 36).  He blames the loss on Officer Rodriguez lying.  (*See id.*).

Abella alleges the aforementioned actions constitute an abuse of power, harassment, intimidation, and stalking by Officer Rodriguez.  (*See id.* Count IV).

### d.  Parking Ticket 2 — Officer Raymond Del Valle

Abella alleges that on February 18, 2008, despite the fact that his car was parked in its assigned condominium parking space, Officer Del Valle left a parking citation on the windshield.  (*See* Am. Compl. ¶¶ 87–89).  Abella requested a court date, and the citation was dismissed.  (*See id.* ¶ 90).

---

[2]  Abella's Amended Complaint contains two counts numbered "V" and two numbered "VII." (*Compare* Am. Compl. p. 19, *with id.* p. 21; *compare id.* p. 26, *with id.* p. 28).  Each count, however, identifies a different Miami Lakes Officer.  To distinguish between the counts, the Court adds a parenthetical containing the relevant Officer's initial, as follows: Count V(V) = Officer Valls; Count V(R) = Officer Rivera; Count VII(S) = Officer Salazar; Count VII(B) = Officer Baez.

Abella alleges the aforementioned actions constitute an abuse of power, harassment, and intimidation by Officer Del Valle.  (*See id.* Count VI).

### e.  Parking Ticket 3 — Officer A. Salazar

On August 12, 2008, Plaintiff ventured to the Miami Lakes Town Hall.  (*See* Am. Compl. ¶ 92).  While there, he "parked in front of the building where there were other cars parked." (*Id.*).  When Abella returned to his car "a couple of minutes later," Officer Salazar was writing Abella a parking ticket.  (*Id.*).  After Abella protested the ticket, Officer Salazar said, "I was given the order to write you a ticket and Bocanegra is watching me until I finish giving you the ticket."  (*Id.* ¶¶ 93–94) (internal quotation marks omitted).  Abella then went home, retrieved his camera, and returned to the scene to photograph the other cars in the same area that were not given parking citations.  (*See id.* ¶ 96).  A couple of days later, Major Bocanegra, along with two other officers, reviewed Abella's parking citation and "decided to rip off [sic] the ticket."  (*Id.* ¶¶ 97, 133).  A few days later, Officer Salazar told Abella that "he was ordered by [Major] Bocanegra to give Abella the citation for improper parking."  (*Id.* ¶ 98).

Abella alleges the aforementioned actions constitute an abuse of power, harassment, and intimidation by Officer Salazar.  (*See id.* Count VII(S)).

### f.  Parking Ticket 4 — Officer Benjamin Rivera

On April 3, 2009, Plaintiff and his wife tried to drop their daughter off at school but there were no available parking spaces.  (*See* Am. Compl. ¶ 67).  Instead, Abella pulled into the driveway of a friend who allows him to use it "at any moment needed."  (*Id.*).  Plaintiff's wife and daughter exited the car and walked to the school.  (*See id.*).  Abella then left the driveway and "went toward Miami Lakeway South and made a Left [sic] to go East."  (*Id.*).  Abella drove into a Congregational Church parking lot and "made a U-turn to comeback [sic] to the school

and pick up his wife." (*Id.* ¶ 68). After observing Abella's driving, Officer Rivera approached Abella's car. (*See id.* ¶ 69). Officer Rivera then issued Abella a parking citation for parking in violation of Florida statute section 316.1945(1)(a)(10).[3] (*See id.* ¶ 71).

Ten minutes later, Abella returned home only to have Officer Rivera arrive outside his residence a few minutes later. (*See id.* ¶ 72). Abella's wife photographed this to "document the police presence outside their apartment." (*Id.* ¶ 73).

Plaintiff challenged the ticket and was granted a court date. (*See id.* ¶ 74). At the June 15, 2009 hearing, Abella claims Officer Rivera lied to the hearing officer about how the events unfolded on April 3, 2009. (*See id.* ¶ 76). Abella maintains that Officer Rivera's behavior at the hearing was so bad that "[m]any times [the hearing officer] had to tell him to calm down." (*Id.*). The hearing continued and at times it got personal between Officer Rivera and Abella. (*See id.* ¶¶ 77–78). After testimony from Abella's wife, the hearing officer found Abella not guilty. (*See id.* ¶¶ 79–81) (internal quotation marks omitted).

Abella alleges the aforementioned actions constitute an abuse of power, harassment, intimidation, and stalking by Officer Rivera. (*See id.* Count V(R)).

### g. Watch Order for Police Presence

In March 2007, the City of Miami Lakes held a town meeting. (*See* Am. Compl. ¶ 19). At the meeting, Abella spoke out against "the attitude of an employee of the Adult Education Classes." (*Id.*). A couple of days after the meeting, on March 14, 2007, the police, via Officer Rodriguez, issued a watch order for police presence coinciding with the days and times Abella's daughter had ballet and martial-arts classes. (*See id.* ¶¶ 19, 29–30). Town Mayor Wayne Slaton later invalidated the watch order. (*See id.* ¶¶ 19, 31).

---

[3] Florida Statute section 316.1945(1)(a)(10) prohibits stopping, standing or parking a vehicle "at any place where official traffic control devices prohibit stopping." FLA. STAT. § 316.1945(1)(a)(10).

Abella asserts the aforementioned actions by Officer Rodriguez violate 42 U.S.C. § 1983. (*See id.* Count III).  Abella also alleges a violation of section 1983 against Councilmember Simon.  (*See* Count I).

### h.  Injunction — Councilmember Simon

On December 19, 2007, Councilmember Simon filed for a "Temporary Injunction for Protection" against Abella.  (Am. Compl. ¶ 23).  Abella claims the injunction contained false allegations against him as revenge for a complaint his wife had filed with the Florida Department of Business and Professional Regulations against Simon in which Simon was ultimately found guilty.  (*See id.*, p. 2).

On December 21, 2007, the injunction was served on Plaintiff.  (*See id.* ¶ 21).  Per the injunction, Abella could not come within 500 feet of Councilmember Simon's residence, nor enter any of the following within the City of Miami Lakes: Town Hall, Publix located at 67 Ave. and NW 154 St., CVS Pharmacy located in the same shopping center as the Publix, Marathon gas station located at 150 NW and 61 Ave., and the Chevron gas station located within 250 feet of Abella's residence.  (*See id.*).  Abella claims he was prevented from buying groceries from the supermarket where he has always shopped.  (*See id.*).  He also could not obtain his daughter's medication from CVS, nor could he buy gas at a station near his residence.  (*See id.*).

On January 31, 2008, a judge dismissed the case against Abella, finding there was no just cause to issue the injunction.  (*See id.* ¶ 25).  Abella additionally claims Councilmember Simon used taxpayer money to compensate the three attorneys she hired for the case.  (*See id.* ¶ 26).

Abella alleges two violations based on the aforementioned actions, both against Councilmember Simon: (a) malicious prosecution for filing the injunction, and (b) a 42 U.S.C. § 1983 violation for the injunction itself.  (*See id.* Counts I, II).

### i. Councilmember Simon Tries to Remove Abella from School Property

In November 2007, Plaintiff and his wife were parked outside their daughter's school when Councilmember Simon "asked [s]chool [s]ecurity to remove [Abella] from the school property." (*Id.* ¶ 20) (internal quotation marks omitted).  School security responded that Abella was neither on school property nor was he doing anything improper.  (*See id.*).  Simon then called the police and within minutes they arrived and "drove by" Abella while he was in his car.  (*Id.*).  Abella alleges Councilmember Simon's actions violate 42 U.S.C. § 1983.  (*See id.* Count I).

### j. Trespass — Officer Richard Baez

On September 19, 2009, Plaintiff's wife and daughter were home when they noticed a police car backing up outside their porch.  (*See* Am. Compl. ¶ 100).  A second police car did the same thing a few minutes later.  (*See id.*).  Plaintiff's wife then grabbed her camera and photographed the police.  (*See id.* ¶ 101).  The two officers exited their vehicles and one of them, Officer Baez, "came inside the porch" to inquire about the pictures.  (*Id.* ¶ 102).  Officer Baez never requested permission to enter Plaintiff's property.  (*See id.* ¶ 104).  Abella claims Officer Baez was not authorized to enter the property.  (*See id.*).

Plaintiff alleges Officer Baez's actions violate 42 U.S.C. § 1983.  (*See id.* Count VII(B)).

### k. Harassment

Between December 2007 and December 2010, Abella was "surrounded anywhere he went in the Town of Miami Lakes by Police Officers." (Am. Compl. ¶ 114).  Notably, there was a police presence outside Abella's porch and his daughter's school.  (*See id.* ¶¶ 83, 85, 115).  Officers would remain outside his residence for more than four hours with their cars' motors running.  (*See id.* ¶ 116–16 [sic]).  Abella requested an investigation in order to put a stop to the

"abuse of power, violation of civil rights . . . intimidation, harassment [and] stalking."  (*Id.* ¶ 118).  But the authorities Abella approached — Miami-Dade State Attorney's Office, Miami-Dade Public Corruption, and Miami-Dade Commission on Ethics — all stated they lacked jurisdiction over the matter.  (*See id.* ¶ 120).  Abella told the Miami-Dade Police Department's Internal Affairs that "all the complaints that have been filed against some of these police officers ended up as contract reports."  (*Id.* ¶ 122) (internal quotation marks omitted).  Abella alleges the aforementioned police actions constitute an abuse of power, harassment, and intimidation by the John Doe Officers, and the same — plus stalking — by Officer Rivera.  (*See id.* Counts VIII, V(R)).

Additionally, on the mornings of June 3 and 4, 2008, while driving next to Abella, Officer Rodriguez was "displaying his sarcasm, [and] making signs with his hands while driving the patrol car."  (*Id.* ¶ 41).  On June 5, 2008, Abella complained to Major Bocanegra, requesting he investigate Officer Rodriguez's "attitude and behavior."  (*Id.* ¶ 42).  Abella never received a response.  (*See id.*).

At approximately 8:15 a.m. on August 20, 2008, Plaintiff was driving with his daughter when Officer Rodriguez "showed up and was driving parallel to [Abella and] being sarcastic." (*Id.* ¶ 43).  A similar incident also occurred in December 2010, which made Abella's daughter arrive "at school in fear."  (*See id.* ¶¶ 53–54).  On this occasion, Abella photographed Officer Rodriguez who then "seemed to be upset of the [sic] pictures and continued with the sarcasm, harassment and intimidation."  (*Id.* ¶ 55).  Abella lodged another complaint with Miami-Dade Internal Affairs.  (*See id.*).

On February 26, 2009, Plaintiff and his wife went to pick their daughter up from school. (*See id.* ¶ 48).  Abella noticed Officer Rodriguez talking to Officer Torres outside Torres's patrol

car.  (*See id.*).  Abella exited his car and photographed of Officer Rodriguez "and this seemed to have bothered him."  (*Id.*).  Officer Rodriguez then drove his car near Abella and asked him to move his car forward.  (*See id.* ¶ 49).  Next, Officer Rodriguez issued Abella a citation for parking in a no-parking space, where "there were 2 [sic] other cars also parked."  (*Id.*).  Officer Rodriguez, however, only cited Abella.  (*See id.*).  While writing up the citation, Abella and Officer Rodriguez exchanged words.  Officer Rodriguez said, "the complaints [Abella] filed with the Commission on Ethics was [sic] not going to do anything to him."  (*Id.* ¶ 50) (internal quotation marks omitted).  Abella responded, "[Officer Rodriguez] should not be wearing a badge."  (*Id.*) (internal quotation marks omitted).  Officer Rodriguez replied, "if you want I would remove my gun."  (*Id.*) (internal quotation marks omitted).

Abella alleges the aforementioned actions from June 2008, August 2008, and February 2009 constitute an abuse of power, harassment, intimidation, and stalking by Officer Rodriguez. (*See id.* Count IV).

On September 21, 2009, Plaintiff and his wife were dropping their daughter off at school when their daughter noticed and recognized Officer Baez.  (*See id.* ¶ 109).  Abella then took a picture of him.  (*See id.*).  Plaintiff's wife and daughter exited the vehicle, at which time Abella drove off because he could not find parking.  (*See id.* ¶ 110).  When he returned to pick up his wife, he started photographing Officer Baez again.  (*See id.*).  At this moment Officer Baez "came and pushed [Abella's] camera toward [Abella's] face and kept pushing inside the window."  (*Id.*).  Abella alleges Officer Baez's actions violate 42 U.S.C. § 1983.  (*See id.* Count VII(B)).

**l.  Negligent Supervision/Non-Responsiveness — Major Frank Bocanegra, Director Robert Parker**

Abella accuses Major Bocanegra of negligently failing to supervise police officers.  (*See* Am. Compl. ¶ 124).  Abella also maintains that former Miami-Dade Police Department Director Parker, as the commanding officer responsible for his police force, did not afford Abella and his family equal protection under the law because he failed to investigate the alleged actions of his police officers.  (*See id.* ¶¶ 137–39).

On several occasions, Abella contacted local authorities to end to the actions of Miami Lakes police officers, namely Officer Rodriguez.  For example, on April 16, 2007, Abella's wife emailed Director Robert Parker complaining about "Officer Juan Rodriguez's attitude and behavior . . . [he] will come after [Plaintiff and his wife] harassing, stalking and intimidating for voicing their opinions in the [Town Hall] meetings."  (*Id.* ¶ 37).  Also on that date, Plaintiff and his wife requested that Miami-Dade Internal Affairs investigate Officer Rodriguez's behavior. (*See id. ¶* 38).  In response to Abella's accusations, the Miami Lakes Town Manager, Alex Rey, on April 16, 2007, emailed Major Bocanegra requesting that he submit a report with conclusions to Rey.  (*See id.* ¶ 126).  On January 8, 2008, Abella's wife requested a copy of that report, but was told "[t]here is no record responsive to this request."  (*Id.* ¶ 127) (internal quotation marks omitted).

Abella's efforts continued.  First, Abella requested Major Bocanegra take action against other officers, including Officer Rodriguez, but Bocanegra took no action.  (*See id.* ¶¶ 128–29). Second, on September 16, 2008, Abella sent a letter to Director Parker detailing all the incidents that he and his family had been subjected to.  (*See id.* ¶¶ 46, 136).  Abella claims his "complaint was just discarded and no action was taken to this date."  (*Id. ¶* 136; *see also* ¶ 46).  Third, in October 2008, Plaintiff, along with his wife, had a meeting with Major Bocanegra.  (*See id.* ¶

47).  Abella claimed that he and his family were victims of Officer Rodriguez's harassment and requested that it be stopped.  (*See id.*).  Fourth, in November 2008, Abella filed a complaint with the Commission on Ethics but "nothing happen [sic]."  (*Id.*).

Abella alleges the aforementioned actions constitutes an abuse of power, harassment, intimidation, and trespassing, as well as violations of section 1983, by Major Bocanegra and Director Parker.  (*See id.* Counts IX–XI).

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

In reviewing the Amended Complaint, the Court is cognizant that, in this circuit, there is a "heightened pleading requirement in section 1983 claims against individuals and plaintiffs cannot rely on 'vague or conclusory' allegations."  *Epps v. Watson*, 492 F.3d 1240, 1242–43 (11th Cir. 2007) (citing *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1367 (11th Cir. 1998); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984)); *see also Horne v. Soc. Sec. Admin.*, 359 F. App'x 138, 143 (11th Cir. 2010).  In section 1983 cases, "the complaint must

allege the relevant facts 'with some specificity.'"  *Epps*, 492 F.3d at 1243 (citing *GJR Invs.*, 132

F.3d at 1367).  With section 1983 complaints,

> [m]ore than mere conclusory notice pleading is required. A
> complaint will be dismissed as insufficient where the allegations it
> contains are vague and conclusory. . . .  Unsupported conclusions
> of law or of mixed fact and law have long been recognized not to
> prevent a Rule 12(b)(6) dismissal.  We must also keep in mind the
> fact that we generally accord official conduct a presumption of
> legitimacy.

*Horne*, 359 F. App'x at 143 (alteration in original) (quoting *Dalrymple v. Reno*, 334 F.3d 991,

993, 996 (11th Cir. 2003)).

### III.  ANALYSIS

In considering the Motions, the Court has grouped Defendants into three categories:

Councilmember Simon, Police Officers, and Supervisors.  All Defendants move to dismiss

Abella's Amended Complaint for a myriad of reasons.  The Court will first consider the

plausibility of each claim against each group of Defendants, and then with any surviving claims,

discuss whether Defendants are entitled to qualified immunity.

**a.  Claims**

**1.  Allegations Against Simon**

**A.  Political Sign**

Plaintiff alleges Councilmember Simon violated his First Amendment rights by directing

police to order Plaintiff to remove a political sign he had in the back of his pickup truck, reading,

"Councilmember Nancy Simon Wants to Pollute Miami Lakes with Signs."[4]  (Am. Compl. ¶¶

18, 28).

---

[4]  The irony of protesting the use of signs with a sign is not lost on the Court.

The First Amendment reads, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech."  U.S. CONST., amend. I.  The First Amendment applies to the states through the Fourteenth Amendment.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).  Political speech receives the highest level of First Amendment protection.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995).  Further, the Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum."  *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).  "Governmental power to circumscribe freedom of speech in public streets is substantially limited."  *Wright v. Town of Southbridge*, No. 07-40305-FDS, 2009 WL 415506, at *4 (D. Mass. Jan. 15, 2009).

Simon disputes Abella's contention that she was the "cause or the motivating force" for the removal order.  (Simon Mot. 5).  She claims the Amended Complaint shows neither that she had authority over the officers nor that she gave the directive.  (*See id.*).  Simon maintains she was not connected to the order in any way, a fact Abella learned after his public-records request returned no evidence of her involvement.  (*See id.* 6).

The Court is not persuaded by Simon's arguments at this stage.  Paragraph 18 of Abella's Amended Complaint describes the entire sign incident in detail.  (*See* Am. Compl. ¶ 18).  He discusses the town-hall meeting that gave rise to the order,[5] the exchange with police regarding the sign, and his efforts to discover who commanded them to remove it.  (*See id.*).  The disputed question, of course, is who actually gave the order.  The final sentence of Paragraph 18 provides the answer (according to Abella and for motion to dismiss purposes).  It reads, "Simon's actions were undertaken as retaliation for [Abella's] exercise of his First Amendment right to free speech."  (*Id.*).  The "actions" are Simon's directive(s) to the police asking Abella to take down

---

[5]  Abella attended a February 2007 town-hall meeting and challenged an issue regarding the posting of commercial signs on right-of-way streets in Miami Lakes.  (*See* Am. Compl. ¶ 18).  Soon thereafter, the police asked him to remove the sign from his pickup truck.

his sign.  Simply put, Abella contends Simon told police to have his sign removed as revenge for speaking his mind at the town hall meeting.  Taken as true — which the Court must do at this stage — Simon's order impermissibly violated Abella's First Amendment rights.  As a result, his First Amendment claim against Simon survives.

Simon also takes issue with Abella's statement that "[e]lected [o]fficials in the Town of Miami Lakes cannot give a direct order to any Police Officer or any employee of the Town of Miami Lakes."[6]  (Am. Compl. ¶ 18; *see also* Simon Mot. 6).  Simon asserts Abella's concession means she, by rule, could not have directed police to request his sign be taken down.  (*See* Simon Mot. 6).  Such inconsistency in Abella's pleading, however, is not dispositive.  *See* FED. R. CIV. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").  His inconsistent statements do not cancel each other out.  As a result, Abella has still alleged a claim under the First Amendment.

### B.  Watch Order

On March 14, 2007, Officer Rodriguez issued a watch order for police presence, coinciding with the days and times Abella's daughter had ballet and martial-arts classes.  (*See* Am. Compl. ¶¶ 19, 29–30).  Abella suggests this order was issued as retribution for complaining about a community-center employee at a March 2007 town-hall meeting.  (*See id.* ¶ 19).  Who directed Officer Rodriguez to issue the watch order is unclear, although many of Abella's assertions implicate Simon.  (*See id.* Count I).

In essence, Abella asserts he has been retaliated against for exercising his First Amendment rights.  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment

---

[6]  Abella inartfully tries to convey that Simon lacks this power under the law, but Simon nevertheless violated the law in so ordering.

rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005).  However, as stated, in section 1983 cases, "the complaint must allege the relevant facts 'with some specificity.'"  *Epps*, 492 F.3d at 1243 (citing *GJR Invs.*, 132 F.3d at 1367).

Here, the watch-order claim fails because it lacks any specificity regarding Simon's involvement.  Abella describes the watch order in four separate paragraphs of his Amended Complaint.  (*See* Am. Compl. ¶¶ 19, 29–31).  Simon's name appears nowhere in any of them.  (*See id.*).  Nor does her title — Councilmember — appear.  (*See id.*).  Moreover, the Court examined a copy of the actual watch order dated March 14, 2007 and noted no reference to Simon.[7]  (*See id.* Ex. B [ECF No. 17]).  The Court finds no facts that refer to Simon; the connection to her is too attenuated (or non-existent) to survive a motion to dismiss.

Even if the Court reads Simon's involvement into the watch order issuance, Abella's claim still fails because he alleges insufficient facts showing Simon acted in retaliation.  He puts forth no facts to suggest any of the following: (a) that Simon attended the town-hall meeting where Abella spoke out, (b) that Simon knew Abella complained about a community-center employee, or (c) that Simon knew the employee of which Abella complained.

In sum, Abella alleges insufficient facts showing Simon either commanded the watch order or that she acted in a retaliatory way.  As a result, the Court dismisses this claim.

### C.  Removal from School Property

Abella also claims Simon violated his constitutional rights when she *tried* to have him removed from school property.  (*See id.* ¶ 20).  According to Abella, he was parked outside his daughter's school when Simon asked school security to remove him.  (*See id.*).  Security refused

---

[7] Abella attaches a copy of the watch order to his Amended Complaint.  (*See* Am. Compl.).  "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  FED. R. CIV. P. 10(c).  "Under Rule 10(c) . . . such attachments are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion."  *Solis-Ramirez v. U.S. Dep't of Justice*, 758 F.2d 1426, 1430 (11th Cir. 1985).

to do so.  (*See id.*).  Simon then called the police and a few minutes later "two (2) patrol vehicles and a motorized police officer drove by" Abella in his parked car.  (*Id.*).

"Section 1983 requires the plaintiff to show that he 'was deprived of a federal right by a person acting under color of state law.'"  *Leonard v. F.B.I.*, 405 F. App'x 386, 387 (11th Cir. 2010) (quoting *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001)).  Section 1983 only provides a remedy where there has been deprivation of constitutional rights.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002); *see also Leonard*, 405 F. App'x at 387 (citation omitted).

In this claim, Abella alleges no deprivation of any right.  Abella describes an event where Simon sought to have him removed from school property, but his assertions are noticeably devoid of any injuries suffered as a result.  (*See* Am. Compl. ¶ 20).  There was no citation issued, no arrest made, no harassment alleged, no physical contact or resulting injuries, nor any emotional distress or resulting injuries.  (*See id.*).  He did not even get a stern talking to.  (*See id.*).  Surely police driving by someone as he sits in a parked car falls well short of a constitutional-rights violation.  *See Gonzaga Univ.*, 536 U.S. at 274 (noting section 1983 protects rights, not vague benefits or interests).

Because Abella fails to allege an injury or deprivation, his claim is dismissed.

### D.  Injunction

Finally, Abella contends Simon improperly sought and received an injunction against him in retaliation for a complaint his wife filed with the Florida Department of Business and Professional Regulations.  (*See* Am. Compl. ¶ 23; *see also id.* p. 2).  Abella claims Simon's actions constitute malicious prosecution.  (*See id.* Count II).

To establish a federal malicious prosecution claim under section 1983, "a plaintiff must establish '(1) the elements of the common law tort of malicious prosecution, and (2) a violation of [his] Fourth Amendment right to be free from unreasonable seizures.'" *Shaarbay v. Palm Beach Cnty. Jail*, 350 F. App'x 359, 362 (11th Cir. 2009) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004)).  Regarding the first prong, the Eleventh Circuit "has looked to both federal and state law and determined how those elements have historically developed." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (citations omitted).  To establish the first prong under Florida law,

> a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Kingsland*, 382 F.3d at 1234 (citing *Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)).

Construing Abella's Amended Complaint in the light most favorable to him, the Court finds Abella's allegations sufficient to meet the first prong.  Abella asserts the following: (1) the temporary injunction was an original judicial proceeding against Abella, (2) for which he was the legal cause, (3) the injunction was terminated in favor of Abella, (4) after a finding of no just cause by the judge, (5) because Councilmember Simon fabricated a story to get the injunction passed, which could show malice,[8] and (6) for which Plaintiff suffered damages by preventing

---

[8]  *See Shaarbay*, 350 F. App'x at 362 (agreeing with the plaintiff that allegations of police officers' fabricated testimony "could show malice").

him access to grocery stores, gas stations, and a pharmacy.  (*See* Am. Compl. ¶¶ 21, 23).  All six elements are sufficiently pleaded to survive a motion to dismiss.

To meet the second prong, a plaintiff must establish he was seized in violation of the Fourth Amendment.  *See Shaarbay*, 350 F. App'x at 362.  A seizure is "[t]he act or an instance of taking possession of a person or property by legal right or process; esp., in constitutional law, a confiscation or arrest that may interfere with a person's reasonable expectation of privacy." BLACK'S LAW DICTIONARY (9th ed. 2009).  A constructive seizure is "[a] manifest intent to seize and take possession of another person's property, usu. either by lawfully acquiring actual custody and control of the property or by posting notice of the property's pending foreclosure." *Id.*

The United States Supreme Court has long held that a person is "seized" under the Fourth Amendment when, in light of the surrounding circumstances, a reasonable person would not feel free to leave from a police encounter.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (finding a seizure occurs when "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal quotation marks omitted).  Conversely, "[i]f a reasonable person would feel free to terminate the encounter [with police], then he or she has not been seized."  *United States v. Drayton* 536 U.S. 194, 201 (2002).  Noticeably, Fourth Amendment cases are most often addressed in a criminal context.  To that end, a Fourth Amendment seizure in relation to a malicious prosecution claim will be triggered by either a warrant or an arraignment.  *See Kingsland*, 382 F.3d at 1235; *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995); *Love v. Oliver*, 450 F. Supp. 2d 1336, 1342 (N.D. Ga. 2006).

For this reason, Plaintiff's malicious prosecution claim under section 1983 must fail. Here, there has been no warrant issued, nor has Plaintiff been arraigned.  In fact, this is a civil case.  Absent criminal proceedings, there can be no section 1983 claim.  *See Smith v. Mass. Dep't of Corr.*, 936 F.2d 1390, 1402 (1st Cir. 1991) (A federal claim under section 1983 "'for malicious prosecution differs from the state civil suit in that it requires that state officials acting under color of law institute the criminal proceedings against the plaintiff.'") (quoting *Torres v. Superintendent of Police of Puerto Rico, et. al.*, 893 F.2d 404, 409 (1st Cir. 1990)).

Even if a seizure were to somehow apply to civil suits under federal law, "a Fourth Amendment violation 'requires an intentional acquisition of physical control.'"  *Shaarbay*, 350 F. App'x at 362 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)).  To constitute a seizure, there must be a detention or taking.  *See id.*  Here, Plaintiff alleges Simon received an injunction that prevented him from accessing local stores around Miami Lakes.  This measure was taken to keep Abella *out* of specific businesses around town.  Abella in no way suggests his person, or his property, fell into the physical control of local authorities.  Abella was never questioned, accosted, or arrested by police; none of his property was detained or taken; nor does he allege constructive interference with his person or property.  As a result, neither Abella's person nor his property was seized under the Fourth Amendment.

Nonetheless, even if the Court found that Abella was "seized," "[s]eizure alone is not enough for § 1983 liability; the seizure must be unreasonable."  *Brower*, 489 U.S. at 1382–83 (internal quotation marks omitted).  Courts addressing reasonableness under section 1983 typically do so in the context of police force or similar show of authority.  *See id.* (addressing a police roadblock); *Walker v. Huntsville, Ala.*, 310 F. App'x 335, 337–38 (11th Cir. 2009) (evaluating an officer's arrest); *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)

(examining an investigatory stop).  Here, Plaintiff was prevented from accessing two Publix grocery stores, two gas stations and one CVS Pharmacy.  (*See* Am. Compl. ¶ 21).  There is no roadblock, arrest, or investigatory stop involved.  At most, the facts demonstrate Abella was inconvenienced, but given the ubiquitous nature of these enterprises, it is hardly "unreasonable" to think Abella can simply find other stores around town to meet his needs — even if less desirable.  Consequently, if there was a seizure, it was not unreasonable.

Because Abella has alleged insufficient facts to show a Fourth Amendment violation, this claim is dismissed.

### 2.  Allegations Against Police Officers

The Court now turns to the claims against the individual Police Officers.

### A.  First Amendment

As discussed, Abella asserts he was asked by Officer Rodriguez to remove a sign he was displaying on his truck, reading "Councilmember Nancy Simon Wants to Pollute Miami Lakes with Signs."  (*See* Am. Compl. ¶¶ 18, 28).  Plaintiff refused to remove the sign.  (*See id.*).

As noted, political speech receives the highest level of First Amendment protection. *See McIntyre*, 514 U.S. at 346–47. Although Defendants assert Plaintiff was not injured because Plaintiff never removed the sign (*see, e.g.*, Rodriguez Mot. 10), an "injury" in a First Amendment claim is broadly construed.  *Wright*, 2009 WL 415506, at *5.  The mere possibility of punishment as a result of speech may constitute an injury under the First Amendment; a First Amendment claim may arise from an

> injury caused by the threat that the speaker will be prosecuted or otherwise punished for his or her speech.  In this circumstance, plaintiffs "may have standing even if they have never been prosecuted or threatened with prosecution."  It is the possibility of a punishment as the price of one's speech, whether or not the threat of being sanctioned is realized, that causes harm to the speaker.

> While this type of injury is most often asserted by plaintiffs
> challenging the threat of criminal prosecution, it also applies when
> the threatened sanction takes the form of a regulatory or financial
> penalty.

*Parow v. Kinnon*, 300 F. Supp. 2d 256, 261–62 (D. Mass. 2004) (quoting *Diamond v. Charles*, 476 U.S. 54, 65 (1986); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56–57 (1st Cir. 2003); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996)).  In *Wright*, although the plaintiffs never removed their sign, the court determined they were injured because they were presented with an ultimatum: remove their signs or leave town.  *See Wright*, 2009 WL 415506, at *5.

Here, Plaintiff was threatened that if he did not remove the sign, he would be given a citation.  (*See* Am. Compl. ¶ 18).  This threat, even though Plaintiff never removed his sign, is sufficient to demonstrate an injury.  Further, the Court is cognizant that "[d]ismissal of a complaint on a 12(b)(6) motion 'is a dubious practice in a close[] case, particularly one involving a First Amendment claim.  Summary judgment allows a broader basis for decision, and a hearing of evidence an even broader basis.'"  *Wright*, 2009 WL 415506, at *5 (alteration in original) (quoting *Dewey v. Univ. of N.H.*, 694 F.2d 1, 3 (1st Cir. 1982)).  Plaintiff has thus alleged a claim under the First Amendment.

### B.  Parking Tickets

#### i.  *Parking in a Handicapped Space*

Plaintiff complains that he was given a ticket by Officer Rodriguez "for being parked blocking the handicap spaces."  (Am. Compl. ¶ 33).  When dropping off his daughter at school in April 2007, Plaintiff stopped his car in front of some handicapped spaces.  (*See id.*).  While waiting, Officer Rodriguez asked Plaintiff to move his car.  (*See id.* ¶ 34).  Plaintiff replied that he could not because there were barricades surrounding the school and parking was limited.  (*See*

*id.*).  He asserts that he was never "parked," but had his motor running and was waiting for his wife.  (*Id.* ¶ 33).  He also contends that all handicapped spaces were already taken.  (*See id.* ¶ 35).  Despite Plaintiff's protestations, Officer Rodriguez cited Plaintiff.  (*See id.*).  Plaintiff challenged the ticket in court, losing "due to the false statement that Officer Juan Rodriguez stated . . . ."[9]  (*Id.* ¶ 36).

On these allegations, there can be no section 1983 violation based on the parking ticket. Plaintiff's description of his own actions demonstrates Officer Rodriguez properly ticketed Plaintiff.

Florida Statute section 316.1955(1) makes it

> unlawful for any person to stop, stand, or park a vehicle within, or to obstruct, any such specially designated and marked parking space provided in accordance with s. 553.5041, unless the vehicle displays a disabled parking permit issued under s. 316.1958 or s. 320.0848 or a license plate issued under s. 320.084, s. 320.0842, s. 320.0843, or s. 320.0845, and the vehicle is transporting the person to whom the displayed permit is issued.

FLA. STAT. § 316.1955(1).  Florida Statutes define the terms "stop," "stand," and "park."  *Id.* § 316.003.  To "park" is defined as "[t]he standing of a vehicle, whether occupied or not, otherwise than temporarily for the purpose of and while actually engaged in loading or unloading merchandise or passengers as may be permitted by law under this chapter."  *Id.* § 316.003(27). To "stand" is defined as "[t]he halting of a vehicle, whether occupied or not, otherwise than temporarily, for the purpose of, and while actually engaged in, receiving or discharging passengers, as may be permitted by law under this chapter."  *Id.* § 316.003(49).  And to "stop" is,

---

[9]  Plaintiff complains of Officer Rodriguez's "lies" at the hearing.  (Am. Compl. ¶ 36).  Plaintiff's bald assertion of a lie (*i.e.*, he does not state how Officer Rodriguez lied or even what Officer Rodriguez lied about) at the hearing does not state a claim under section 1983.  "Witnesses are granted absolute immunity from § 1983 claims for their testimony during trials."  *Jones v. Luis*, 372 F. App'x 967, 970 (11th Cir. 2010) (citing *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999)).  This includes police officers.  *See Cannon*, 174 F.3d at 1281 (citations omitted).  The penalty for any "lies" is a perjury prosecution.  *Id.* (citations omitted).

"[w]hen prohibited, any halting, even momentarily, of a vehicle, whether occupied or not, except when necessary to avoid conflict with other traffic or to comply with the directions of a law enforcement officer or traffic control sign or signal." *Id.* § 316.003(52).

Based on the definitions of stop, stand, and park, and based on Plaintiff's description of the incident, it is clear that Plaintiff had halted his car in a manner that obstructed a handicapped space.  Section 316.1955(1) prohibits stopping, so under that section Plaintiff's halting of his vehicle while waiting for his wife was a violation of that section; when stopping is prohibited, unlike with standing and parking, persons cannot even temporarily halt their car to load or unload passengers.  Thus, for Plaintiff to halt his vehicle in order to drop off his daughter at school in a spot that obstructed the handicapped spaces violated Florida law.  Officer Rodriguez therefore properly ticketed Plaintiff.  Plaintiff's contention that he was not "parked," even if true, is irrelevant under section 316.1955 because the section prohibits stopping.

Moreover, Officer Rodriguez properly followed the method prescribed in section 316.1955(1) in remedying a violation.  He first asked Plaintiff to move his car.  (*See* Am. Compl. ¶ 34); Fla. Stat. § 316.1955(1)(a).  Then, when Plaintiff refused to move his car, Officer Rodriguez ticketed Plaintiff.  (*See* Am. Compl. ¶ 35); Fla. Stat. § 316.1955(1)(b).  Based on Plaintiff's own description, Officer Rodriguez had probable cause to believe Plaintiff was violating section 316.1955(1).  Plaintiff's rights were not violated by this incident.

### ii.  *No Standing*

Plaintiff also complains about a citation he received for parking in a "no[-]parking space." (Am. Compl. ¶ 49).  He asserts that only he received a ticket, even though he was one of three cars parked in the no-parking zone.  (*See id.*).  Plaintiff indicates that only he received a ticket because he and Officer Rodriguez — the ticketing officer — had a history; Plaintiff

complained about Officer Rodriguez to the Commission on Ethics.  (*See id.* ¶ 50).

When Plaintiff arrived to pick up his daughter on February 26, 2009, he noticed Officer Rodriguez standing outside his car and speaking with Officer Torres.  (*See id.* ¶ 48).  Once Plaintiff saw Officer Rodriguez, he exited his car and began photographing him.  (*See id.*).  Upon seeing Plaintiff photographing him, Officer Rodriguez returned to his car and drove over to where Plaintiff was.  When Officer Rodriguez arrived at Plaintiff's location, he asked Plaintiff to move his car.  (*See id.* ¶ 49).  Officer Rodriguez then ticketed Plaintiff.  (*See id.*).

Florida Statute section 316.1955 prohibits stopping, standing, or parking where "an official traffic control device" prohibits stopping, standing or parking.  FLA. STAT. §§ 316.1955(1)(a)(10), 316.1955(1)(b)(7), 316.1955(1)(c)(2).  "Official traffic control devices include: "[a]ll signs, signals, markings, and devices, not inconsistent with this chapter, placed or erected by authority of a public body or official having jurisdiction for the purpose of regulating, warning, or guiding traffic."  *Id.* § 316.003(23).  An exception to the section 316.1955 prohibitions occurs where a person is "momentarily" standing or parking to pick up or discharge passengers.  *Id.* §§ 316.1955(1)(b)(7), 316.1955(1)(c)(2).

Here, by Plaintiff's own admission, he was not parked solely for the purpose of picking up his daughter.  Once he saw Officer Rodriguez talking with Officer Torres, he parked for the purpose of exiting his vehicle to photograph Officer Rodriguez.  And he parked, by his own admission, in a no-parking zone.  (*See* Am. Compl. ¶ 49).  Once Plaintiff parked in a no-parking zone for a purpose other than picking up his daughter, he violated Florida Statute section 316.1955.  Officer Rodriguez was therefore within his discretion to ticket Plaintiff whether or not he ticketed other drivers.  Because Plaintiff violated Florida law, there is no constitutional violation based on the traffic ticket

### iii.  *Parking in a Prohibited Space*

Plaintiff further laments about a parking ticket he received from Officer Rivera.  (*See* Am. Compl. ¶¶ 67–71).  He contends that when dropping his daughter off at school on April 3, 2009, there were no parking spaces.[10]  (*See id.* ¶ 67).  As a result, he pulled into a friend's driveway to let his daughter and wife out.  (*See id.*).  This friend has previously authorized Plaintiff to use her driveway.  (*See id.*).  After dropping off his wife and daughter, Plaintiff pulled out, went to the church, and made a U-turn to return to the school to retrieve his wife.  (*See id.* ¶ 68).  When he arrived back at the school, Plaintiff noticed Officer Rivera.  (*See id.* ¶ 69).  Officer Rivera told Plaintiff to pull over because he was going to issue a citation.  (*See id.* ¶ 70).  Officer Rivera then issued plaintiff a citation for violating Florida Statute section 316.1945(1)(a)(10).  (*See id.* ¶ 71).  Plaintiff challenged the ticket and was successful in defeating it.[11]  (*See id.* ¶¶ 74–82).

Florida Statute section 316.1945(1)(a)(10) prohibits stopping, standing, or parking "[a]t any place where official traffic control devices prohibit stopping."  FLA. STAT. § 316.1945(1)(a)(10).

Plaintiff does not state any constitutional violation by these actions.[12]  "[T]he mere erroneous issuance of a parking ticket simply does not create a plausible inference of

---

[10]  It is a waste of federal resources to have a federal district court consider a squabble between a man and police over a couple of parking tickets.

[11]  Plaintiff complains of Officer Rivera's conduct at the hearing, claiming he became angry and lied. (*See* Am. Compl. ¶¶ 75–82).  Although this information may just be included for added flavor, Plaintiff may also be resting his claims on this conduct.  None of Officer Rivera's actions at the hearing, however, are actionable under section 1983 for the reasons outlined in note 9.  *See Luis*, 372 F. App'x at 970 (citing *Cannon*, 174 F.3d at 1281).  Even if Officer Rivera's language was derogatory, as is further discussed below, this does not result in section 1983 liability.  *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir. 1999).

[12]  As is described below, this ticket may be included when considering whether there has been ongoing harassment as retaliation for Plaintiff expressing his First Amendment rights.

constitutional violations . . . ."  *Davis v. City of Cincinnati*, No. 1:09-CV-00832, 2010 WL 3656040, at *5 (S.D. Ohio Sept. 14, 2010).  Moreover, although Plaintiff ultimately prevailed, he never asserts that he did not stop, stand, or park in a place where a traffic control device prohibited stopping.  Instead, the facts as alleged demonstrate that it was more plausible that the ticket was dismissed on procedural grounds — because Officer Rivera transcribed one letter of Plaintiff's license plate incorrectly on the citation.[13]  (*See* Am. Compl. ¶ 71).

## C.  Rude Hand Signs

Plaintiff asserts his constitutional rights were violated when Officer Rodriguez "harassed" him by "making signs, fists, etc. with his hands" without regard to the presence of a child in the car.  (Am. Compl. ¶¶ 53, 55).

A police officer's use of derogatory language does not violate the Constitution.  *See DeWalt*, 224 F.3d at 612 ("The use of racially derogatory [or sexually explicit] language, while unprofessional and deplorable, does not violate the Constitution.") (citations omitted).  "Where

---

[13]  Plaintiff complains about another parking citation he received on February 18, 2008.  In that situation, Officer Del Valle left the ticket purportedly while Plaintiff's vehicle was parked in its assigned spot at his condominium complex.  (*See* Am. Compl. ¶¶ 87–89).  The citation was ultimately dismissed.  (*See id.* ¶ 90).  Plaintiff never asserts a constitutional violation occurred from this ticket, only that it constituted an abuse of authority as well as harassment and intimidation.  (*See id.* Count VI).  Further, unlike the other ticket allegations (some of which specifically cite section 1983), this Count lacks facts.  While the Court does not consider the ticket individually with respect to whether it alone constituted a violation of Plaintiff's constitutional rights, it is part of the question, addressed below, as to whether the ongoing harassment constituted retaliation against Plaintiff's expression of his First Amendment rights.

Similarly, Plaintiff never asserts he was wrongfully issued a fourth ticket (*see* Count VII(S)).  He simply states he received a ticket after going into a municipal building for a few minutes.  (*See* Am. Compl. ¶ 92).  Plaintiff only points out that other cars were similarly parked out front.  (*See id.*).  This is not evidence that he was legally parked.  That the ticket was later "ripped off [sic]" (*id.* ¶ 97), is just as much an indication of a sympathetic sergeant as it is an admission the ticket was improperly issued.  A possibility does not equal plausibility.  *See Rodriguez v. Holder*, No. 10–24108–CIV, 2011 WL 2911927, at *4 (S.D. Fla. Mar. 9, 2011) (quoting *Twombly*, 550 U.S. at 570).  Like with the third citation, while the Court does not consider the ticket individually with respect to whether it constitutes a violation of Plaintiff's constitutional rights, it is part of the inquiry regarding whether the ongoing harassment constitutes retaliation against Plaintiff for expressing his First Amendment rights.

the conduct at issue consists solely of speech, there is no [constitutional] violation." *Bramer*, 180 F.3d at 706.  Where there is some other "harassment or some other conduct that deprives the victim of established rights" then the speech may contribute to a constitutional violation.  *Id.*  In sum, "[a]s a matter of law, verbal abuse, including threatening language and gestures, cannot amount to constitutional violations." *Bender v. City of New York*, No. 09 CV 3286(BSJ), 2011 WL 4344203, at *8 (S.D.N.Y. Sept. 14, 2011) (citation omitted); *see also Julscliff v. Wal-Mart*, No. 3-09-CV-2158-K-BD, 2010 WL 3431669, at *2 (N.D. Tex. July 23, 2010).

Furthermore, Plaintiff does not even describe an assault.  "An 'assault' is an *intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Colony Ins. Co. v. Barnes*, 410 F. Supp. 2d 1137, 1142 (N.D. Fla. 2005) (emphasis in original) (citing *Lay v. Kremer*, 411 So. 2d 1347 (Fla. 1st DCA 1982)).  An assault must be based on "a threat to use force, or the actual exertion of force." *Id.*  To be placed in apprehension necessary to justify an assault claim "the other must believe that the act may result in imminent contact unless prevented from so resulting by the other's self-defensive action or by his flight or by the intervention of some outside force." RESTATEMENT (SECOND) OF TORTS § 24 (2005). Considering that Officer Rodriguez's hand gestures occurred while he and Plaintiff were in different cars, there was no threat that the hand gestures would result in imminent contact.[14]

Plaintiff's description of Officer Rodriguez's actions do not amount to a constitutional violation.  Although perhaps ill-advised and unprofessional, a police officer's hand gestures, no matter how rude, do not support a claim under section 1983.

---

[14]  Plaintiff does not allege that Officer Rodriguez threatened to crash his car into Plaintiff's.

### D.  Not Filing a Police Report

Plaintiff also complains about Officer Valls not filing a police report.  Plaintiff describes how on January 7, 2008, he saw the president of his condominium association passing out flyers.  (*See* Am. Compl. ¶ 57).  Plaintiff states the flyers contained "libel [sic] information" against him and originated from Simon.  (*Id.*).  In response, Plaintiff called the police and Officer Valls arrived, took the flyer from Plaintiff, and then declined to write a police report.  (*See id.* ¶ 58).  After Plaintiff insisted that Officer Valls write a report, Officer Valls became angry and asked Plaintiff if he wanted to get arrested.  (*See id.* ¶ 59).  Officer Valls then left.[15]  (*See id.* ¶ 51).

This claim fails because there is no right to have the police write a police report.  Courts have held that there is no constitutional right to a correct police report.  *See Jarrett v. Twp. of Bensalem*, 312 F. App'x 505, 507 (3d Cir. 2009) ("[T]he mere existence of an allegedly incorrect police report fails to implicate constitutional rights."); *Landrigan v. City of Warwick*, 628 F.2d 736, 745 (1st Cir. 1980).  If it is not a constitutional violation to file a *false* police report, it cannot be a constitutional violation to file *no* police report.  Even assuming for the moment that a crime was committed on January 7, 2008, the Court fails to see a difference between Officer Valls taking no police report, or filing a false police report stating no crime had occurred.  If the latter would not violate Plaintiff's constitutional rights, the former could not either.

If Plaintiff is merely complaining about Officer Valls's rude speech, that claim fails for reasons already explained.

---

[15]  Plaintiff also laments that Officer Valls left with his "evidence."  (Am. Compl. ¶ 61).  Plaintiff, however, asserts "flyers" (plural) were handed out.  (*Id.* ¶ 57).  He therefore could have simply picked up another one.  Furthermore, Plaintiff does not allege a Fourth Amendment seizure or a Fifth Amendment taking.  Finally, Plaintiff cannot effectively amend his Amended Complain by adding claims of theft (*see* Mot. Opp'n at 4, ¶ 3 [ECF No. 53]), in his moving papers.  "'[A] court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.'"  *Fed. Ins. Co. v. Bonded Lightning Prot. Sys., Inc.*, No. 07-80767-CIV, 2008 WL 5111260, at *3 (S.D. Fla. Dec. 3, 2008) (quoting *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)).

Finally, under Florida law, "[t]he Florida Supreme Court has recognized that there is no 'common law duty of care owed to an individual with respect to the discretionary judgmental power granted a police officer . . . to enforce the law." *Albra v. City of Ft. Lauderdale*, 232 F. App'x 885, 888 (11th Cir. 2007) (quoting *Everton v. Willard*, 468 So. 2d 936, 938 (Fla. 1985)). "Police officers have a duty to protect the public as a whole, but do not owe the victim of a crime," even assuming Plaintiff was a victim of a crime by virtue of the flyers, "any common law duty of care, absent a special duty to, or relationship with, the victim." *Id.* (citing *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001)). Police possess discretion to "choose whether to make an arrest or enforce the law . . . ." *Id.* (citing *Everton*, 468 So. 2d at 938). Plaintiff alleges no special duty or relationship with the police, and no claim arises under Florida law.

## E.  Assault and Negligence

Plaintiff also asserts that Officer Valls "almost" hit him with his patrol car. (Am. Compl. ¶ 61). After Officer Valls refused to write a police report, he went to leave in his car. Officer Valls placed his car in reverse and "told Plaintiff to move out of his way." (*Id.*). He then left and almost — but did not — hit Plaintiff.

This does not state a claim. One could argue this claim comes close to alleging assault. As discussed, an assault occurs when an actor "(a) [] acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1) (2005). Comment f to the Restatement outlines the necessary intent for an assault:

> In order to become liable under the rule stated in this Section, it is
> necessary that the actor intend to inflict a harmful or offensive

> bodily contact upon the other or a third person or put him in apprehension of such contact.  Unless he acts with such intent, the actor is not liable for an assault although his conduct creates an unreasonable risk of causing such an apprehension to another and although such apprehension is actually caused.  The interest in freedom from apprehension of a harmful or offensive contact is protected only against acts intended to inflict a bodily contact or to cause an apprehension of such contact, and not against conduct which creates such a risk of it that, had the risk threatened bodily harm, it would constitute negligence.

*Id.* cmt. f.  Plaintiff does not allege that Officer Valls intended to hit him with the car or intended to create an unreasonable risk of apprehension in Plaintiff.  Rather, as Plaintiff states, Officer Valls told him to move out of his way.  Plaintiff never even contends he feared he would be hit.  The facts therefore demonstrate that there was neither an intent to hit Plaintiff nor an intent to cause him to believe he would be hit.  As a result, Plaintiff does not allege a plausible assault claim.  At most, the facts demonstrate Officer Valls may have been negligent; but without an injury, a negligence claim would fail.

### F.  Trespass

Plaintiff asserts a civil-rights violation based on a trespass.  On September 19, 2009, Plaintiff's wife and daughter were at home when the daughter noticed police cars outside.  (*See* Am. Compl. ¶ 100).  Plaintiff's wife then retrieved her camera and began photographing the police.  (*See id.* ¶ 101).  The police then exited their cars and entered Plaintiff's property and porch to ask Plaintiff's wife some questions.  (*See id.* ¶ 102).  They never entered Plaintiff's home, remaining outside Plaintiff's door at all times.  (*See id.* ¶ 103).  Plaintiff asserts the police never had permission to step on to Plaintiff's property.  (*See id.* ¶ 104).[16]  Plaintiff does not

---

[16]  In Count 7, the claim where the trespass is asserted, Plaintiff makes multiple allegations concerning how his wife and daughter felt.  (*See* Am. Compl. ¶¶ 100–12).  The only named Plaintiff, however, is Gustavo Abella.  As a *pro se* Plaintiff, Abella may only represent himself.  *See Conner v. Penn. Nat. Mut. Cas.*,  No. 07-14301-CIV, 2008 WL 2944662, at *1 (S.D. Fla. July 31, 2008) (citing *Timson v. Sampson*, 518 F.3d 870, 873 (11th Cir. 2008)).  "The competence of a layman is 'clearly too limited to

contend anyone told the police to leave.

In Florida, criminal trespass on property occurs when

> A person who, without being authorized, licensed, or invited, willfully enters upon or remains in any property other than a structure or conveyance:
>
> 1. As to which notice against entering or remaining is given, either by actual communication to the offender or by posting, fencing, or cultivation as described in s. 810.011; or
>
> 2. If the property is the unenclosed curtilage of a dwelling and the offender enters or remains with the intent to commit an offense thereon, other than the offense of trespass,
>
> commits the offense of trespass on property other than a structure or conveyance.

FLA. STAT. § 810.09(1)(a). "As to civil trespass, a trespass to real property is an injury to or use of the land of another by one having no right or authority." *State v. Sarantopoulos*, 604 So. 2d 551, 555 n.7 (Fla. 2d DCA 1992) (citing *Brown v. Solary*, 19 So. 161 (1896)). Although no actual damages are alleged here as a result of the police's trespass, Plaintiff could be entitled to nominal damages and costs. *See id.* Nevertheless, Plaintiff does not assert a claim for trespass.

Police may enter a person's curtilage for legitimate purposes. *See Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011) ("It is well-established that police officers can enter onto

---

allow him to risk the rights of others.'" *Charest v. Williams*, No. 2:07cv984-MHT, 2008 WL 686621, at *1 (M.D. Ala. Mar. 7, 2008) (quoting *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)). That Plaintiff's daughter may be a minor is of no moment; a *pro se*, non-lawyer parent may not represent a child in a lawsuit filed under the child's name. *See Whitehurst v. Wal-Mart*, 306 F. App'x 446, 449 (11th Cir. 2008) ("[W]hile individuals have the right to proceed *pro se*, and Federal Rule of Civil Procedure 17 authorizes a conservator or guardian to sue on behalf of a minor child, a non-lawyer parent has no right to *represent* a child in an action in the child's name.") (emphasis in original) (citations omitted). Plaintiff, therefore, may not assert claims on his wife's or daughter's behalf. Furthermore, he may not personally assert claims based on any injuries to his wife or daughter because he lacks standing to do so. "'[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business.") (citing 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f) (4th ed. 2004)).  The portion of the curtilage that is a normal route of access for any visitors is considered only "semi-private."  *Id.* (citing 1 LaFAVE, *supra* § 2.3(f)).  "'Absent express orders from the person in possession,' an officer may 'walk up the steps and knock on the front door of any man's "castle," with the honest intent of asking questions of the occupant thereof.'"  *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)).  "Thus, '[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an [sic] any private citizen may.'"  *Id.* (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003)).  The Fourth Amendment is not violated when the police simply enter a porch.  *See Coffin*, 642 F.3d at 1012 ("It cannot be said [that] the defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon.") (quoting *Florida v. Detlefson*, 335 So. 2d 371, 372 (Fla. 1st DCA 1976)); *United States v. Bergin*, 732 F. Supp. 2d 1235, 1244 (M.D. Fla. 2010) (citing *Payton v. New York*, 445 U.S. 573, 590 (1980)).

Plaintiff describes that when the police approached to question his wife,[17] they remained in places the public could reasonably expect to be; any delivery person would, in a like manner, approach the door and remain on the porch.  *See Coffin*, 642 F.3d at 1012 ("In carrying out their duties, the police are free to go where the public would be expected to go.") (citing 1 LaFAVE, *supra* § 2.3(c)).  Entering the porch area does not violate the Fourth Amendment (even if it were

---

[17]   There was never a search of the home or property.  If there was a violation of Plaintiff's wife's rights from the questioning, it is for her to assert, not Plaintiff.

determined a "search" occurred).   There are no allegations that the police entered Plaintiff's condominium or that Plaintiff's wife or daughter ordered them to leave the premises.

Plaintiff alleges insufficient facts to show a civil-rights violation.   There was no search that can be challenged on Fourth Amendment grounds, no taking that can be challenged on Fifth Amendment grounds, and his personal rights were not violated because he was not home and the police never entered his home.   Simply put, the Court can conceive of no violation against *Plaintiff's* constitutional rights as a result of the police entering onto Plaintiff's property, in Plaintiff's absence, and asking his wife questions.

### G.  Photography

Plaintiff asserts that while photographing Officer Baez at Plaintiff's daughter's school, Officer Baez pushed Plaintiff's camera toward his face and inside his car window.   (*See* Am. Compl. ¶ 110).  As a result, Plaintiff claims his constitutional rights were violated.

When a police officer uses force in the course of making an arrest, investigatory stop, or other "seizure" of a person, the claim is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake."  *Id.* at 396 (citations omitted).  The question is "whether the totality of the circumstances justified a particular . . . seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

When determining whether Officer Baez's use of force was reasonable, the Court must judge his actions "from the perspective of a reasonable officer on the scene . . . ."  *Graham*, 490

U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

This reasonableness inquiry is an objective one.  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  Neither Officer Baez's good nor his evil intentions may be considered.  *See id.* "Under the *Zeigler/Rich* formulation of the objective-reasonableness test, a government official proves that he acted within his discretionary authority by showing '"objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."'"  *Courson*, 939 F.2d at 1487 (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)); *see also Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (per curiam).

Here, Plaintiff was photographing a police officer in a public area, something he has a First Amendment right to do. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("As to the First Amendment claim under Section 1983, we agree with the [plaintiffs] that they had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct.  The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.").  In response, Officer Baez approached and "pushed Plaintiff's camera toward plaintiff's face and kept pushing inside the window."  (Am. Compl. ¶ 110). Plaintiff does not allege the camera or Officer Baez made contact with Plaintiff's face.  Nor does he allege any physical injury, even as small as a bruise or bloody nose.

The Eleventh Circuit "has long declined to entertain claims of excessive force predicated upon the use of *de minimus* force by law enforcement."  *Croom v. Balkwill*, 645 F.3d 1240, 1252 (11th Cir. 2011) (citing *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)).  Like the Eleventh Circuit found in *Croom*, even though Officer Baez's use of force was unnecessary and rude, it does not rise to the level of a constitutional violation.  *See id.* 1252 (finding the deputy's use of force, including pushing plaintiff "to the ground from her squatting position and holding her there with a foot (or knee) in the back for up to ten minutes" was *de minimis*); *see also McCall v. Crosthwait*, 590 F. Supp. 2d 1337, 1344–45 (M.D. Ala. 2008) (finding the force *de minimis* where the officer "pushed [plaintiff] with such force that he fell into a steel door and plexiglass window.").  Officer Baez's use of force was not even as severe as the defendants' in *Croom* and *McCall*.  A section-1983 excessive-force claim may not lie on Officer Baez's unnecessary, yet minor, use of force.

This may, however, raise a First Amendment claim.  "To establish a *prima facie* First Amendment violation, [Plaintiff] must show: (1) 'that a state actor took some adverse action against [him] (2) because of (3) [his] protected conduct, and that such action (4) chilled [the] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'"  *Fuller v. County of Orange*, 276 F. App'x 675, 680 (9th Cir. 2008) (quoting *Rhodes v. Robinson,* 408 F.3d 559, 567–68 (9th Cir. 2005)).  Here, Officer Baez took adverse action (pushing the camera), because of Plaintiff's protected conduct (photographing Officer Baez in a public space), which chilled Plaintiff's exercise of his First Amendment rights (he stopped taking pictures).  Plaintiff has therefore set forth a *prima facie* First Amendment claim.

### H.  Harassment

Throughout his Amended Complaint, Plaintiff alleges harassment, intimidation, stalking, and abuse of power against various named and unnamed police officers.  (*See* Am. Compl. Counts IV, V(V), V(R), VI, VII(S), VIII, X, XI).  This alleged harassment includes being cited for traffic and parking violations (*see id.* ¶¶ 33–36, 49–50, 67–71, 87–89, 92–98), the police driving near Plaintiff and making hand signals and being sarcastic (*see id.* ¶¶ 41–43, 53), the police simply existing (*see id.* ¶¶ 44–45), police being present at a school at a time when Plaintiff arrives (*see id.* ¶¶ 48, 83–85), the police not writing a police report and taking a flyer from Plaintiff (*see id.* ¶¶ 57–64), Plaintiff *almost* being hit by a police car after being told to move out of a car's way (*see id.* ¶ 61), having police sit outside Plaintiff's apartment (*see id.* ¶¶ 72–73, 83–85), being yelled at in court (*see id.* ¶¶ 75–81), being "surrounded" at all times by police officers (*see id.* ¶¶ 114–16), and failing to stop the harassment (*see id.* ¶¶ 126–32, 136–39).  These claims evidently arise as a result of Plaintiff's exercise of his First Amendment rights.  (*See id.* ¶¶ 1, 50, 77, 110).  He exercised those rights, *inter alia*, by displaying a sign, filing complaints about the police, and photographing the police.  (*See id.* ¶¶ 28, 38, 42, 46–47, 51, 65, 110–11, 118–22, 128, 135–36).  The police acknowledged they were aware of Plaintiff's complaints and indicated they were acting in response.[18]  (*See id.* ¶ 50).

Harassment alone is not a constitutional violation.  *See Garrison v. Fisher*, No. C 10–1441 JSW (PR), 2010 WL 4735995, at *2 (N.D. Cal. Nov. 15, 2010).  But harassment may be actionable under section 1983 when it is undertaken in retaliation for the exercise of one's First-Amendment rights.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250–54 (11th Cir. 2005).

---

[18]  A Miami-Dade Circuit judge recently held "the police department is the exclusive agency responsible for receiving, investigating and determining complaints against its sworn police officers under state law." Deborah C. Espana, *Inspector General Can't Investigate Police, Judge Says*, DAILY BUSINESS REVIEW, Nov. 17, 2011, at A5 (internal quotation marks omitted).

Plaintiff in essence asserts he has been retaliated against for exercising his First Amendment rights.  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254.

> To state a retaliation claim, the commonly accepted formulation requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech.

*Id.* at 1250 (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

The adversely affected prong is determined through an objective standard: "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id.* at 1250–54.  A retaliation claim "depends not on the denial of a constitutional right, but on the harassment they received for exercising their rights." *Id.* at 1253.  Here, Plaintiff has established his speech was constitutionally protected.  The sign concerning Ms. Simon was protected political speech. Furthermore, Plaintiff's complaints to the police and about the police are protected because "'[t]he rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment.'" *Jackson v. New York*, 381 F. Supp. 2d 80, 89 (N.D.N.Y. 2005) (quoting *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)).  "The Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)).  A causal connection between Plaintiff's First Amendment actions and the harassment is

then demonstrated through Officers Rodriguez's and Salazar's statements.  (*See* Am. Compl. ¶¶ 50, 77, 94–98).

Plaintiff has alleged sufficient facts demonstrating harassment throughout his Amended Complaint to set forth a plausible claim of retaliation.[19]  *See, e.g., Bennett*, 423 F.3d at 1254 ("The alleged retaliatory acts complained of here include a prolonged and organized campaign of harassment by local police officers.  Taken in the light most favorable to the plaintiffs, the record is replete with instances where the defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs."); *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (asserting it was a jury question regarding police retaliation where plaintiff was issued $35 in parking tickets in a two-month span and the "threat of further harassment could reasonably be inferred.").  "Numerous courts have found that harassment in the form of constant monitoring, investigating or issuance of violations can contravene First Amendment rights."  *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 430 F. Supp. 2d 1296, 1316 (S.D. Fla. 2006) (collecting cases).   Here, where the allegations extend beyond Defendants' "mere speech" and Defendants engaged "the punitive machinery of government in order to punish" Plaintiff, even if the retaliation includes petty offenses of parking tickets, the retaliation claim may proceed.  *See Garcia*, 348 F.3d at 729.

### 3.  Allegations Against Supervisors

Plaintiff also asserts claims against Major Bocanegra and Director Parker based on their positions as the officers' supervisors.  (*See* Am. Compl. Counts IX–XI).

The argument that Major Bocanegra or Director Parker ("Supervisor Defendants") should be held liable on the basis of *respondeat superior* or vicarious liability can quickly be discarded.

---

[19]  While individually certain of Plaintiff's allegations in and of themselves would not give rise to section 1983 liability, when taken in total, a pattern emerges that allows the harassment claim to proceed.

"It is well established that § 1983 claims may not be brought against supervisory officials on the basis of vicarious liability or *respondeat superior*." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)); *Gutierrez v. City of Hialeah*, 723 F. Supp. 1494, 1499 (S.D. Fla. 1989) ("The law is well established that an action pursuant to Section 1983 cannot be based upon the theory of *respondeat superior*.  A plaintiff must establish that a supervisor . . . actually exercised control over the officer in connection with the conduct at issue . . . .") (citing *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658 (1978); *Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985); *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985)).

A supervisor may be held liable, however, "'when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation.'"  *Keating*, 598 F.3d at 762 (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)).

Plaintiff asserts Major Bocanegra ordered Officer Salazar to issue Plaintiff a citation. (*See* Am. Compl. ¶¶ 92–98, 131).  While the Court has determined that the issuance of that ticket itself did not violate any constitutional right, the ticket was a part of the ongoing harassment taken in retaliation to Plaintiff's exercise of his First Amendment rights.  Major Bocanegra, therefore, based on the allegations in the Amended Complaint, personally participated in the alleged constitutional violations.[20]

---

[20]  Plaintiff asserts two claims against Major Bocanegra — in Counts IX and X.  Although Count X states a claim, Count IX is dismissed on *Iqbal* and *Twombly* grounds.  Count IX incorporates paragraphs 1–16, but those paragraphs fail to save the sole paragraph constituting this claim.  The entire claim asserted in Count IX reads:

> Defendant BOCANEGRA acted negligent [sic] when he allowed that [sic] the before mentioned police officers, who were under his supervision as the Town Commander of the Police in Miami Lakes abuse

There are no allegations in the Amended Complaint that Director Parker personally participated in the harassment, so he may only be held liable if there is a causal connection between his alleged actions and the constitutional violations.  Likewise, Major Bocanegra may be additionally liable if there is a causal connection between his actions and the constitutional violations.

A causal connection may be established when:

> [1] a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so[;] . . . [2] when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights[;] . . . [3] when facts support 'an inference that the supervisor directed the subordinates to act unlawfully[;] or [4] knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal citations and quotation marks omitted).   Here, Plaintiff asserts that causal connections arise from the Defendants either directing the officers to act unlawfully, or because the Supervisor Defendants knew the officers were acting unlawfully and failed to stop them.  (*See* Am. Compl. ¶¶ 126–39).

Plaintiff asserts he repeatedly sent letters and emails to Major Bocanegra, and Major Bocanegra sought to meet with Plaintiff in order to stop the harassment.  (*See id.*).  Major Bocanegra, however, ultimately failed to take any action.  (*See id.*).  These facts raise the plausible inference that Major Bocanegra knew his subordinates — the individual police officers

---

their power [sic], violating the Plaintiff's civil rights and trespassing [sic] Plaintiff's property.

(Am. Compl. ¶ 124 (all caps in original)).   This is the type of conclusory and fact-deficient claim prohibited by *Iqbal* and *Twombly*.  *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).   These "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are insufficient.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  This Count fails under those standards, as well as the heightened pleading standard required in section 1983 claims.  *See Horne*, 359 F. App'x at 143; *Epps*, 492 F.3d at 1242–43.

— were acting unlawfully by harassing Plaintiff in retaliation for Plaintiff's expression of his First Amendment rights and Major Bocanegra failed to stop them from doing so.[21]

With Chief Parker, the allegations are that he failed to respond to Plaintiff's letter, failed to investigate the officers' actions, failed to stop the officers' actions, and failed to provide equal protection.  (*See id.* ¶¶ 135–39).  Unlike with Major Bocanegra, except for alleging Plaintiff and his attorney sent letters to Chief Parker, there are no facts contained within the claim against Chief Parker; Plaintiff asserts mere conclusions.[22]  (*See id.*).  This claim therefore fails on *Iqbal* and *Twombly* grounds as well as under the heightened pleading standard required for section 1983 claims.  *See Horne*, 359 F. App'x at 143; *Epps*, 492 F.3d at 1242–43.

### b.  Qualified Immunity

The Court now addresses whether any of the Defendants are entitled to a qualified-immunity defense.

### 1.  Councilmember Simon

Having determined Abella has stated plausible First-Amendment claims, the Court turns to the question of whether Councilmember Nancy Simon is entitled to qualified immunity.

---

[21]  Plaintiff also, in conclusory fashion, asserts "Bocanegra failed to provide equal protection under the law to Plaintiff and his family." (Am. Compl. ¶ 130).  Putting aside for the moment that Plaintiff, acting *pro se* may not assert claims on behalf of his family, he simply does not allege an equal-protection violation.  "[T]o establish a violation of the Equal Protection Clause, [Plaintiff] must prove discriminatory motive or purpose."  *Cross v. Ala. State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 122 (5th Cir. 1980)).  Plaintiff alleges no discrimination; the facts indicate Defendants, including Major Bocanegra, acted as they did because either Plaintiff continuously violated parking and traffic laws, or they did not appreciate his continual photographing of them and filing reports complaining about their actions.  There are no allegations of racial, sexual, national origin, alienage, or *any* discriminatory animus by Defendants. "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker, . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 278–79 (1979) (citation omitted).  Plaintiff alleges no such identifiable group.

[22]  That Plaintiff sent a letter and did not receive a response does not support the unfounded conclusions asserted in the claim's remaining paragraphs.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kingsland*, 382 F.3d at 1231 (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).  In order to be entitled to the qualified-immunity defense, a government official must demonstrate that the acts complained of were committed within the scope of the officer's discretionary authority.  *Id.* at 1232.  Once the officer has done so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *see also McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("[O]nce an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.").[23]  This is embodied in the Eleventh Circuit's two-part *Zeigler*/*Rich* analysis:

> 1.   The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."
>
> 2.   Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part.  This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

---

[23]  This is equally true when considering a Rule 12(b)(6) motion to dismiss.  *See Epps*, 492 F.3d 1240, 1244–45 (11th Cir.2007).  The Eleventh Circuit has described the inquiry under Rule 12(b)(6) as:

> A public official who asserts a defense of qualified immunity must establish that he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains."  Where there is no dispute as to the discretionary nature of the actions complained of, like here, we look to determine (1) whether the plaintiff has factually alleged the deprivation of a constitutional right; and (2) whether that right was clearly established at the time of the violation.  The plaintiff bears the burden of proof as to both of these determinations.

*Id.* (citations omitted).

*Courson*, 939 F.2d at 1487 (quoting *Dollar*, 841 F.2d at 1563); *Zeigler*, 716 F.2d at 849.[24]

In order to prevent dismissal of his or her claims under the doctrine of qualified immunity, a plaintiff must show that the facts, taken in the light most favorable to the plaintiff, demonstrate the defendant violated a constitutional right.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Sharp v. Fisher*, 532 F.3d 1180, 1183 (11th Cir. 2008); *McClish,* 483 F.3d at 1237.  Even if the facts demonstrate a violation, the plaintiff bears the burden to demonstrate the constitutional rights were "clearly established" at the time of the violation.  *See Saucier*, 533 U.S. at 201; *Sharp*, 532 F.3d at 1183; *McClish*, 483 F.3d at 1237.  Decisions of the United States Supreme Court, the Eleventh Circuit, and the Supreme Court of Florida can clearly establish law in this jurisdiction.  *See McClish*, 483 F.3d at 1237.  For the law to be "clearly established," it must be so clear that every objectively reasonable official understands it to prohibit the challenged act.  *See Vinyard*, 311 F.3d at 1353.  The purpose of this requirement is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206.

> That the very act (or something materially similar to it) in question has previously been held unlawful by a court is not always necessary.  But in light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious.  Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

*Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003); *Montoute*, 114 F.3d at 184 ("[T]he qualified immunity standard is broad enough to cover some 'mistaken judgment,' and it shields from liability 'all but the plainly incompetent or those who knowingly violate the

---

[24] District judges now have the discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986))).

Simon was an elected official at the time of the conduct at issue.  Therefore, the burden shifts to Abella to demonstrate that Simon violated a clearly established statutory or constitutional right to overcome the qualified immunity defense.

Abella's only remaining claim against Simon is based on a First Amendment violation — that Simon wrongfully ordered the police to ask Abella to remove a political sign.  As the Court has noted, this is political speech protected by the First Amendment.  The right to engage in political speech is well-established law.  *See McIntyre*, 514 U.S. at 346–47; *Frisby*, 487 U.S. at 480.  Simon's actions ordering Abella to remove a sign protesting a political decision in a public area are not entitled to qualified immunity.  Abella's right to protest Simon's actions was "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009) (holding right to distribute pamphlets clearly established) (quoting *Saucier*, 533 U.S. at 202).  Any argument this right was not clearly established lacks merit.

Based on the foregoing, Councilmember Simon is not entitled to qualified immunity against Abella's claim that she violated his First Amendment rights by ordering police to have him remove his political-protest sign.

### 2.  Police Officers

The Court now turns to the question of whether the police officer Defendants are entitled to qualified immunity.

Defendants were government officials performing discretionary functions at the time of the conduct at issue.  Therefore, the burden again shifts to Plaintiff to demonstrate that Defendants violated a clearly established statutory or constitutional right to overcome the

qualified immunity defense.

All of Plaintiff's remaining claims against the police Defendants (officers and the Major) are based on First Amendment violations — that Defendants wrongfully threatened Plaintiff if he did not remove a political sign, that Defendant Baez physically restricted Plaintiff's ability to photograph police officers, and that Defendants retaliated against Plaintiff by harassing him for exercising his First Amendment rights.

### A.  Plaintiff's Sign

Plaintiff asserts Officer Rodriguez ordered him to take down his sign protesting Simon's actions.  For the same reasons elucidated above, Officer Rodriguez is not entitled to qualified immunity.  In addition,

> Decisions such as *Jamison*[25] and *Grace*,[26] among many others, have put police officers on notice for decades that protestors present on public property have a First Amendment right to peacefully express their views, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech.

*Childs v. Dekalb Cnty., Ga.*, 286 F. App'x 687, 693 (11th Cir. 2008).  Based on the foregoing, Officer Rodriguez is not entitled to qualified immunity against Plaintiff's claim that he violated his First Amendment rights by ordering him to remove his political-protest sign.

### B.  Plaintiff's Photography

Officer Baez is not entitled to qualified immunity on Plaintiff's claims that Officer Baez violated his First Amendment rights by physically preventing his photography.   When photographing Officer Baez, Plaintiff was exercising his First Amendment rights.  *See Smith*, 212 F.3d at 1333.  In a similar factual scenario, the Eleventh Circuit denied an officer qualified

---

[25]  *Jamison v. Texas*, 318 U.S. 413 (1943).

[26]  *United States v. Grace*, 461 U.S. 171 (1983).

immunity when he arrested a person for taking photographs at a public event, finding there was no connection between the photography, even if it "*could* have been used for unlawful activity," and probable cause for arrest.  *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (emphasis in original).  That citizens may photograph police officers in public places has thus been the law in this Circuit for over 15 years.[27]

## C.  Retaliation

The Eleventh Circuit "and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights." *Bennett*, 423 F.3d at 1255–56 (collecting cases).  The Eleventh Circuit "has held since at least 1988 that it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights . . . ."  *Id.* 1256 (citations omitted).  All police Defendants — the officers and the Major — thus "were on notice and had 'fair warning' that retaliating" against Plaintiff for his opposition to Nancy Simon, filing police complaints, and photographing Officer Baez would violate his constitutional rights, and if the allegations are true, subject them to liability under section 1983.  *Id.*  The Court thus denies the police Defendants' qualified-immunity defense with respect to Plaintiff's First Amendment retaliation claim.

---

[27]  In 2010, the Third Circuit determined it was not clearly established law in that circuit that citizens have a right to videotape police officers during a traffic stop.  *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) ("[W]e conclude there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on "fair notice" that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment.").  In so determining, the Third Circuit cited the Eleventh Circuit case *Smith*, stating the court there "announce[d] a broad right to videotape police . . . ."  *Id.* at 262.  The Third Circuit then contrasted *Smith* with cases from that circuit.  *See id.*  It was the inconsistent decisions within the Third Circuit that guided the court's determination, as well as the fact that none of the cases concerned traffic stops (as was the situation in *Kelly*).  *See id.*  Here, in the Eleventh Circuit, *Smith* controls and the Court is compelled to find the law is clearly established.

**IV.  CONCLUSION**

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

1.  Nancy Simon's Motion **[ECF No. 36]** is **GRANTED in part** and **DENIED in part**.

2.  The Police Officers' Motions **[ECF No.'s 43, 44, 45, 46, 47, 48]** are **GRANTED in part** and **DENIED in part**.

3.  The Supervisors' Motions **[ECF No.'s 49, 50]** are **GRANTED in part** and **DENIED in part**.

4.  Counts VI, VIII, IX, and X **MAY PROCEED**.  Count II is **DISMISSED**.  Counts I, III, IV, V(R), V(V), VII(S), VII(B), and XI **MAY PROCEED in part** and are **DISMISSED in part**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of November, 2011.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record;
      Gustavo Abella, *pro se*